UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DERRICK D. COLEMAN,

                Petitioner,                        Case No. 1:08-cv-1

v.                                               Honorable Janet T. Neff

CINDI S. CURTIN,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

         This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a term of 240 months to 600 months, imposed by the Ingham County Circuit Court on January 21, 2004, after Petitioner pleaded guilty as a second felony offender to one count of armed robbery, MICH. COMP. LAWS § 750.529, and one count of possessing a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

      I.      PETITIONER WAS DEPRIVED OF HIS LIBERTY WITHOUT DUE PROCESS OF LAW WHERE THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO SPECIFICALLY ENFORCE THE PLEA AGREEMENT, OR PERMIT PETITIONER TO WITHDRAW THE PLEA.

      II.     PETITIONER WAS DEPRIVED OF HIS LIBERTY WITHOUT DUE PROCESS OF LAW WHERE THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY SCORING THE SENTENCING GUIDELINES ON FACTS NOT ADMITTED TO BY THE DEFENDANT OR FOUND BEYOND A REASONABLE DOUBT BY A JURY OR THE COURT.

    III.    PETITIONER MUST BE RESENTENCED WHERE THE STATUTORY SENTENCING GUIDELINES UNDER OV-12 WERE MIS-SCORED AND IMPOSED SENTENCE IS A DEPARTURE FROM THE STATUTORY REQUIREMENTS IN VIOLATION OF DUE PROCESS OF LAW WHERE INACCURATE INFORMATION WAS RELIED UPON IN THE GUIDELINE SCORING AND HIS TRIAL AND APPELLATE COUNSEL'S FAILURE TO OBJECT CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

Respondent has filed an answer to the petition (docket #11) stating that the grounds should be denied because they are noncognizable state law claims, are procedurally defaulted or have no merit. Upon review and applying the AEDPA standards, I find that all grounds are either noncognizable or without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

    The state prosecution arose from the armed robbery of Medawar Jewelry in Okemos, Michigan on March 6, 2003. Petitioner was charged with one count of armed robbery and one count of felony-firearm, and, following a preliminary examination on May 8, 2003, he was bound over on both charges. A supplemental information was filed charging Petitioner as a habitual offender, third offense.

    The facts underlying the conviction are taken from the preliminary examination hearing. On March 6, 2003 at approximately noon, two armed men entered the Medawar Jewelry Store at 2168 E. Grand River in Okemos, Michigan. Neither the clerk, Wanda Miller, nor the owner Katrine Medawar, could positively identify the robbers, though Ms. Medawar was able to testify that they were African American. She also described the clothing worn by the taller robber and testified that he wore a backpack of some sort. (Prelim. Exam. Tr. (P. Tr.), 38-40, 45-48, docket #13.)

According to both Medawar and the videotape, the shorter robber entered the store first.  He pointed a gun at Wanda Miller, who dove under the counter and remained there.  At that time, Ms. Medawar was in the office, speaking with her father on the telephone.  Medawar heard the door and heard her clerk scream.  With the telephone still in her hand, she stepped out of her office and saw two men.  (P. Tr., 34-36.)  The first robber was pointing a gun at Miller but swivelled to point the gun at Medawar.  Medawar saw Wanda Miller crouch under the desk.  She screamed and turned back to her office and shut the door behind her.  (P. Tr., 35-36.)  She hung up the phone on her father and called 911.  (P. Tr., 36.)  While she was on the telephone with the police dispatcher, she heard the door to the store close and then heard a gunshot.  Thereafter, she heard the store door close again.  (P. Tr., 37.)  After the door closed the second time, she looked out her office window and saw a person she believed to be the taller robber walk through the parking lot.  (P. Tr., 38, 47.)  Once the police pulled into the parking lot, she left the office to go into the showroom.  She found Wanda Miller crouched in fear under the desk and saw a damaged display case.  (P. Tr., 40-41.)  Twelve rings valued at $18,398.00 were missing.

A security camera videotape showed that the robbers were armed and that the taller robber wore clothing similar to that described by Medawar.  The tape also showed that the taller robber wore a backpack.  The videotape was admitted as evidence at the preliminary examination.  (P. Tr., 17-26, docket #13.)  According to the videotape, when Medawar went back into her office, the first robber then moved his gun to his left hand and vaulted over the counter, breaking a candy dish.  He moved toward the office door.  (P. Tr., 22-23.)  He attempted to gain entrance to the office.  When he could not, he jumped the counter again and left the store.  (P. Tr., 24.)  Thereafter, the taller robber looked into the jewelry display cases.  (*Id.*)  The taller robber then shot a round into one of

the jewelry cases and reached his hand into the case, removing a number of diamond rings.  (P. Tr., 27.)

The first officer on the scene, Meridian Township Sergeant Lana Howell, reviewed the videotape shortly after arriving at the store.  Within a half hour or forty-five minutes, she issued a better clothing description over the radio, and she requested additional officers.  (P. Tr., 28.)

Wayne Seggebruch, the owner of a restaurant bakery store, testified that his store was located two blocks from Medawar Jewelers.  (P. Tr., 50-51.)  Seggebruch noticed a red Ford Aerostar mini-van that he did not recognize parked next to his delivery van, a location in which customers would not ordinarily park.  (P. Tr., 54.)  The spot was relatively near the National City Bank, but not near its entrance.  (*Id.*)  At first he assumed someone had left the car after meeting someone.  But as he was driving away in his car, he noticed in his left rearview mirror that a black man wearing a down-filled jacket was standing next to his delivery truck.  (P. Tr., 56-57.)  The man was crouched next his van, peering toward Okemos Road.  (P. Tr., 57.)  Seggebruch realized that something was wrong, and he quickly drove around the building and entered the lot from the south entrance.  When he returned, the man he had observed had entered the mini-van and was sitting in the passenger seat with the seat back as far as it would go.  (P. Tr., 57.)  Seggebruch backed his car into the service parking lot near his van.  He noticed a second black man approaching from an alleyway near the National City parking lot.  The man carried something that looked like a mesh bag with something in it, and the man was trying to conceal it in his left hand.  (P. Tr., 59-60.)  The man walked quickly to the mini-van and got into the driver's seat.  Seggebruch made eye contact with both individuals as they sat in the van, but he could not identify them with any certainty.  (P. Tr., 61.)  However, he described the first robber as being more heavy-set and younger, while the second robber was taller

- 4 -

and older.  (P. Tr., 66.)  When Seggebruch pulled his cell phone up, the driver quickly drove away.
(P. Tr., 62.)  Seggebruch followed the mini-van going north on Okemos Road,  and he called 911.
(P. Tr., 63, 65.)  He asked the dispatcher if National City Bank had been robbed.  (P. Tr., 63.)  He
was told no, but he could hear the dispatcher speaking with police officers.  The dispatcher then told
him that shots had been fired at Medawar Jewelry.  Seggebruch told the dispatcher, "I have 'em, I
have – I know where they are."  (P. Tr., 64.)  Seggebruch gave the dispatcher a description of the
vehicle and the license plate number.  (P. Tr., 64.)  The mini-van was traveling about 60 miles per
hour, much faster than the posted speed limit.  (P. Tr., 65.)  Seggebruch followed until he reached
the intersection of Central Park Drive and Marsh Road.  He watched the mini-van run the red light
and turn south onto Marsh Road, but he did not follow.  (P. Tr., 65-66.)

Ingham County Deputy Jon LaCross testified that he was in his patrol car when he
was advised by the radio dispatcher that an armed robbery had occurred at Medawar Jewelers.  The
dispatcher provided a vehicle description of a Ford Aerostar van and provided the license plate
number.  (P. Tr., 71.)  LaCross was advised by his lieutenant to take up an observation point at the
intersection of I-96 and M-52.  (P. Tr., 72.)  LaCross was westbound, looking at eastbound traffic.
He saw a car matching the description.  He turned around in the median.  (P. Tr., 73.)  When he
caught up to the vehicle, the car had just entered Livingston County.  He verified the license plate
and saw two black males in the vehicle.  (P. Tr., 74.)  He notified dispatch that he had found the
vehicle.  The car switched to the right lane when the driver saw LaCross, and the car got off the
freeway at Fowlerville.  (P. Tr., 75-76.)  The car made a right turn and proceeded north on
Fowlerville Road.  The van got stopped on the overpass over I-96 by traffic waiting at the light.
LaCross was stopped directly behind the van.  He saw both occupants of the van moving around and

reaching under the seat.  (P. Tr., 76-77.)  The van appeared to make an unsuccessful attempt to head into oncoming traffic before the light turned.  When the light turned, the driver made a left turn onto the entrance ramp for westbound traffic.  LaCross followed and notified the dispatcher of where he was.  Other police cars joined the pursuit shortly after LaCross passed the Fowlerville scales.  (P. Tr., 77-78.)  Once backup arrived, LaCross activated his overhead lights, but the car did not pull over.  The van increased its speed to 90 miles an hour.  (P. Tr., 78.)  As the van approached the emergency turnaround near Wallace Road, it slowed and turned left into the median.  LaCross got within a foot of the vehicle as he entered the median.  The driver of the van held up his right hand and displayed a handgun to LaCross, shaking the gun up and down.  (P. Tr., 79-80.)  Once he observed the handgun, LaCross put some distance between the van and his patrol car.  (P. Tr., 81.)  The cars proceeded eastbound.  As the van approached the emergency turnaround near Nicholson Road, the driver turned left into the median.  Then, instead of making a left turn onto the roadway, the driver made a right turn, into oncoming traffic.  (P. Tr., 81.)  The driver then made an immediate left turn toward the shoulder of the road on the north side of the westbound lane.  (P. Tr., 82.)  Both occupants of the van jumped out and ran on foot northbound from the interstate and into a field.  (P. Tr., 82-83.)  By this time, three other officers had arrived at the scene.  LaCross followed the robbers at a distance of about 50 yards.  The field was under about one and one-half feet of snow.  As the robbers ran, LaCross could see that one of the men was carrying a gun in his right hand.  (P. Tr., 83.)  LaCross repeatedly told the men to stop and identified himself as police, but the men ignored him.  (P. Tr., 84.)  The men turned toward the northwest.  One of the men stopped near some stacked cement culverts.  (P. Tr., 84-85.)  The man ducked behind the culverts briefly, then both men continued running, separated by some distance.  (P. Tr., 85.)  LaCross knew that additional officers

had joined the effort, and his main objective was to keep the individuals in sight to observe where they traveled.  (P. Tr., 86.)  He was not on the scene when they were apprehended, but he later saw Petitioner in a patrol car after he had been secured.  (P. Tr., 86.)  LaCross then obtained a ride back to his patrol car, and he remained at the scene where the van had parked.  (P. Tr., 88.)  He subsequently joined Michigan State Police Trooper Johnson with a tracking dog, and they attempted to locate items of evidence that might have been left behind as the robbers ran, such as jewelry and guns.  (P. Tr., 88.)  They followed the tracks in the snow, and ultimately the dog located a grey hooded sweatshirt, a black Nike stocking hat, and a black duffel bag with backpack straps.  (P. Tr., 89-90.)  In the bag, the officers found a receipt book, a notebook, and a manila envelope containing tax information belonging to Petitioner.  In the stocking hat, which was located in the culvert, they found six rings.  (P. Tr., 90.)  Subsequently, they found a loaded, semi-automatic handgun and a tan Michigan State stocking cap.  (P. Tr., 93.)

On December 1, 2003, Petitioner pleaded guilty to armed robbery and felony firearm, and the prosecutor agreed to reduce the charge of third felony offender to second felony offender.  The prosecutor also agreed that Offense Variable (OV) 14 would be scored at zero.  (Plea Tr., docket #14.)

On January 21, 2004, Petitioner was sentenced.  The presentence investigation report (PSI) calculated a minimum sentencing guidelines range of 126 to 262 months and recommended a sentence of 262 to 600 months.  Defense counsel objected to the scoring of OV 19 at 15 points, which was based on the use or threatened use of some force to interfere with justice.  (Sentencing Transcript (S. Tr.), 4, docket #15.)  The prosecutor responded that the variable was scored based on the fact that, while he was fleeing and eluding the police, Petitioner had brandished a firearm at

Officer LaCross. The court accepted the scoring of OV 19 at 15 points. During allocution, Petitioner advised the court that he believed that the agreement under which he pleaded guilty had changed between the time of his plea and the time of sentencing. (S. Tr., 8.) At the time he entered his plea, Petitioner understood his guideline sentencing range would start at 108 months. However, the PSI included a minimum sentencing guideline range beginning at 126 months. (S. Tr., 9.) The court advised Petitioner that his plea meant he was accepting responsibility for the crimes regardless of what the guidelines were. Petitioner responded that he understood and still intended to accept responsibility, but he was confused. (S. Tr., 9-10.) The court then asked, "Sir, based on the comments you're telling me, are you telling this Court that you want to withdraw your plea and start all over or you want to continue?" (S. Tr., 10.) Petitioner stated that he was not withdrawing his plea because he was guilty. He also stated that he wanted to continue with the sentencing proceedings. (S. Tr., 10.)

The prosecutor responded to Petitioner's suggestion that a particular sentence agreement had been reached. The prosecutor reported that the only agreement about the sentence was that OV 14 would be scored as zero, which had been placed on the record at the plea hearing. (S. Tr., 11.) The court ultimately sentenced Petitioner as a second felony offender to serve a term of 262 to 600 months for the armed robbery and a consecutive term of two years for the felony-firearm conviction. (S. Tr., 16.)

Petitioner filed a *pro se* motion for resentencing on January 21, 2004. In his motion, he challenged the amount of restitution that had been ordered. On March 19, 2004, the court issued a corrected judgment of sentence, which reflected restitution in the amount of $9,199.00. (Def. Br. on Appeal, 3, docket #17.)

Petitioner filed a second *pro se* motion for resentencing, seeking specific performance of the plea agreement allegedly reached between his attorney and the prosecutor. He requested an evidentiary hearing and provided an affidavit from his father attesting to the fact that his son had been promised a plea agreement in the range of 108-225 months. After appellate counsel was appointed, the attorney filed a supplemental memorandum in support of Petitioner's motion for resentencing. The trial court held a hearing on November 16, 2004 and denied the motion.

### B.      Direct Appeal

Petitioner sought leave to appeal to the Michigan Court of Appeals. His brief, which was filed by counsel on December 3, 2004, raised two claims:

> I.      THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO SPECIFICALLY ENFORCE THE PLEA AGREEMENT OR TO PERMIT DEFENDANT TO WITHDRAW HIS PLEA.

> II.     THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY SCORING THE GUIDELINES ON FACTS NOT ADMITTED TO BY THE DEFENDANT OR FOUND BEYOND A REASONABLE DOUBT BY A JURY OR THE COURT.

(See Def.-Appellant's Br. on Appeal, docket #17.)   Petitioner sought leave to file a *pro per* supplemental brief on February 24, 2005, in which he raised three issues:

> I.      DID THE PROSECUTOR VIOLATE DEFENDANT'S DUE PROCESS AND CONSTITUTIONAL RIGHTS BY NOT SATISFYING HIS OBLIGATION UNDER THE PLEA AGREEMENT THAT WAS ESTABLISHED DECEMBER 1, 2003.

> II.     DEFENDANT'S SENTENCE IS WHOLLY UNSUPPORTED BY THE RECORD WHICH ESTABLISHED THE FACTUAL BASIS OF GUILT AND THUS VIOLATING DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL DUE PROCESS RIGHTS.

> III.    DID THE COURT RELY ON INACCURATE INFORMATION WHICH WAS MATERIALLY FALSE WITHIN DEFENDANT'S PRESENTENCE

- 9 -

REPORT VIOLATING DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS BY USING THE MISINFORMATION AT SENTENCING.

(Def. Supp. Br. on Appeal, docket #17.)  By unpublished order filed January 24, 1997, the Michigan Court of Appeals denied the delayed application for leave to appeal for lack of merit and denied the motion to file the supplemental brief on appeal.  (*See* 4/1/05 Mich. Ct. App. Ord. (MCOA Ord.), docket #17.)  Petitioner filed a *pro per* motion for rehearing or reconsideration on April 15, 2005. The court of appeals denied the motion on May 19, 2005.  (5/19/05 MCOA Ord., docket #17.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same five claims raised in his original and supplemental briefs on appeal in the Michigan Court of Appeals, together with a sixth issue:

> VI.   THE TRIAL COURT VIOLATED DEFENDANTS [SIC] FEDERAL CONSTITUTIONAL RIGHTS, US CONST, AMEND V, VI, XIV, AT SENTENCING BY SCORING THE STATUTORY SENTENCING GUIDELINES BASED ON ITS FINDING OF ADDITIONAL FACTS, WHICH THE PROSECUTOR HAD NOT CHARGED, WHICH HAD NOT BEEN SUBMITTED TO THE JURY AND WHICH DEFENDANT HAD NOT ADMITTED.

(*See* Def. App. for Lv. to Appeal, docket #18.)  By order entered October 31, 2005, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 10/31/05 Mich. Ord., docket #18.)

### C.   Post-conviction relief

Petitioner filed a motion to amend his presentence report under MICH. CT. R. 6.429(C) on September 6, 2005, objecting to certain contemporaneous felonies scored under OV 12 on the grounds that the variable was mis-scored under state law and in violation of his right to due process.  He also argued that his attorney and rendered ineffective assistance of counsel by failing

to object to the scoring of the variable at sentencing.  On March 17, 2006, the Ingham County Circuit Court denied the motion on the grounds that Petitioner had not properly preserved the issue.  (Cir. Ct. Ord., docket #19.)  Petitioner filed a delayed application for leave to appeal to the Michigan Court of Appeals raising the same issue.  Petitioner also filed a motion to remand for resentencing in that court.  On November 9, 2006, the court of appeals issued an order denying the motion to remand and denying leave to appeal for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (11/9/06 MCOA Ord., docket #19.)

Petitioner sought leave to appeal to the Michigan Supreme Court, which denied leave on May 30, 2007, on the grounds that Petitioner had failed to establish entitlement to relief under MICH. CT. R. 6.508(D).  (5/30/07 Mich. Ord., docket #20.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

- 11 -

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.       Failure to Enforce the Plea Agreement

In his first ground for habeas relief, Petitioner asserts that he was denied due process when the presentence investigation report scored his minimum sentencing range as 126 to 262 months rather than 108 to 225 months, as he allegedly was promised in the plea agreement negotiated with the prosecutor.

It has long been the case that a valid guilty plea bars habeas review of most non-jurisdictional claims alleging antecedent violations of constitutional rights.   *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973).   Among claims not barred are those that challenge "the very power of the State to bring the defendant into court to answer the charge against him," *Blackledge v. Perry*, 417 U.S. 21, 30 (1974), and those that challenge the validity of the guilty plea itself.  *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985);  *Haring v. Prosise*, 462 U.S. 306, 320 (1983);  *Tollett*, 411 U.S. at 267.  A plea not voluntarily and intelligently made has been obtained in violation of due process and is void.  *See McCarthy v. United States*, 394 U.S. 459, 466 (1969).  Petitioner's claim does not challenge the power of the state to bring him into court.   Thus, the only means available for challenging his conviction is to claim that his plea is invalid, i.e., it was not knowingly and voluntarily entered into.  *See Mabry v. Johnson*, 467 U.S. 504, 508 (1984) ("It is well-settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.").

The test for determining a guilty plea's validity is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill*, 474 U.S. at 56 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).  Courts assessing

whether a defendant's plea is valid look to all of the relevant circumstances surrounding the guilty plea, including such factors as whether there is evidence of factual guilt. *Brady v. United States*, 397 U.S. 742, 749 (1970).

The state bears the burden of showing that a petitioner's plea was voluntary, knowing and intelligent. *Stumpf v. Mitchell*, 367 F.3d 594, 600 (6th Cir. 2004), *rev'd in part on other grounds*, *Bradshaw v. Stumpf*, 545 U.S. 175 (2005). The state generally satisfies this burden by producing a transcript of the plea proceeding. *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993). A state-court finding that the plea was proper is accorded a presumption of correctness. *Railey v. Webb*, 540 F.3d 393, 417 (6th Cir. 2008) (citing *Garcia*, 991 F.2d at 326). To enter a knowing plea, the defendant must understand the true nature of the charge against him. *Stumpf*, 367 F.3d at 608. The reviewing court ordinarily will presume that defense counsel has explained the elements of the crime to a defendant pleading guilty, even where the record does not reflect any statement by counsel to that effect. *Id.* at 607-08. "'If a defendant understands the charges against him, understands the consequences of a guilty plea, and voluntarily chooses to plead guilty, without being coerced to do so, the guilty plea . . . will be upheld on federal review.'" *Desmyther v. Bouchard*, 108 F. App'x 364, 366-67 (6th Cir. 2004) (quoting *Frank v. Blackburn*, 646 F.2d 873, 882 (5th Cir. 1980)).

In the instant case, Petitioner unquestionably was advised of both the nature of the charges against him and the consequences of his guilty plea. The prosecutor recited on the record the nature of the offenses with which Petitioner was charged and the maximum punishment for those offenses, which included life imprisonment on the armed robbery charge. (Plea Tr., 5.) The prosecutor also stated that the maximum penalty for a second felony offender generally was one and

- 15 -

one-half times the maximum penalty for the offense, recognizing, however, that the maximum penalty on the armed robbery offense already was life.  (Plea Tr., 6.)

Moreover, contrary to Petitioner's representations, there exists no evidence on the record of the plea hearing that suggests that Petitioner was promised any sentence or sentence range or was coerced in any way to enter a plea.  Indeed, after the prosecutor had presented the summary of charges and penalties, the court expressly inquired whether there existed "[a]ny other information or agreements."  (Plea Tr., 6.)  The only other agreement identified was the agreement that Offense Variable 14 would be scored at zero.  (Plea Tr., 7.)  Further, during the plea colloquy, the court repeatedly asked Petitioner himself about whether other promises were made:

> THE COURT:  And if your plea is accepted by me today you will be giving up any claim that the plea was the result of any promise or threats that were not told to me today and that this was not your own choice; do you understand?
>
> THE DEFENDANT:  Yes.
>
> . . .
>
> THE COURT:  Have there been any other promises, threats, or agreements or coercion to get you to plead guilty?
>
> THE DEFENDANT:  No.

(Plea Tr., 10-11.)  Thereafter, the prosecutor again explained the plea agreement:

> MR. PURDY:  In terms of the plea agreement, and that plea agreement is that we obviously will dismiss the habitual third offense in exchange for his plea to the habitual second, and also there's simply an agreement that offense variable number 14 will be scored as zero.

(Plea Tr., 11.)  Defense counsel acknowledged that the prosecutor's statement was accurate, and Petitioner expressly denied having been told how the Court would sentence him.  (Plea Tr., 11.)

Under settled Sixth Circuit authority, petitioner's responses to the trial judge, given under oath at the plea hearing, preclude his present assertion that the prosecutor offered him a specific sentence range in exchange for a plea of guilty.  In *Baker v. United States*, 781 F.2d 85 (6th Cir. 1986), the trial court inquired concerning the terms of any plea bargain, received a response from the prosecutor on the record, and received denials from defense counsel, the prosecutor, and the defendant concerning the existence of any other terms.  The Sixth Circuit held that where the trial court has scrupulously followed the required procedure, "the defendant is bound by his statements in response to that court's inquiry."  781 F.2d at 90 (quoting *Moore v. Estelle*, 526 F.2d 690, 696-97 (5th Cir. 1976)).  The Sixth Circuit, noting the obvious, observed that a trial judge cannot possibly administer a plea agreement, if it consists of "secret terms known only to the parties."  *Id.* at 90.  Furthermore, because defendant's later claim of a secret agreement was negated by the trial record, no evidentiary hearing was required.  *Id.* at 92.  The court again addressed this issue in *Warner v. United States*, 975 F.2d 1207 (6th Cir. 1992), and *United States v. Todaro*, 982 F.2d 1025 (6th Cir. 1993), also section 2255 cases.  In *Todaro*, the defendant attempted to attack his guilty plea, claiming that his attorney had promised him that he would be sentenced to probation if he pled guilty.  The defendant had testified at the plea colloquy, however, that no other promises had been made to him, other than those stated in the plea agreement.  982 F.2d at 1026.  Consequently, the Sixth Circuit was again faced with a situation in which a defendant's post-conviction allegations were directly contrary to his statements at the plea hearing.  Relying on *Baker*, the court reiterated its earlier holding, under which a defendant is bound by his statements in response to the trial court's inquiry, where there has been a careful plea colloquy.  In *Warner*, the Sixth Circuit likewise rejected claims of attorney promises in the face of

- 17 -

defendant's flat denial of promises at the plea, holding that the petitioner's statements "estopped" him from relying on undisclosed promises.  975 F.2d at 1210.[1]

On the basis of the plea colloquy, the trial court accepted the plea, finding that it "was given freely, understandingly, voluntarily made, without undue influence, threats, promise of leniency."  (Plea Tr., 16.)  In light of all the circumstances, the trial court's finding is completely reasonable and entitled to a presumption of correctness on habeas review.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Petitioner has failed to show by clear and convincing evidence that the state-court's finding was erroneous.  *Id.*

Moreover, even could Petitioner demonstrate that his plea was not knowing, intelligent or voluntary, he has waived his right to the only remedy available to him.  At the sentencing hearing, Petitioner raised the issue of the alleged promise about the minimum guideline recommendations. (S. Tr., 8-10.)  The sentencing judge expressly inquired whether Petitioner wished to withdraw his plea on the basis of the alleged plea agreement.  (S. Tr., 10.)  Petitioner emphatically stated that he did not wish to withdraw his plea.  (S. Tr., 10.)  Petitioner therefore has waived any argument that he should be entitled to withdraw his plea.

For all the stated reasons, I recommend that Petitioner's first ground for habeas relief be denied.

---

[1] Thereafter, the court in *Peavy v. United States*, 31 F.3d 1341 (6th Cir. 1994), ordered an evidentiary hearing to inquire into allegations of an undisclosed plea agreement.  The *Peavy* court noted that the government admitted the existence of an oral plea agreement, not reflected at the plea hearing.  The court was careful to observe that the trial court had not directly asked the defendant whether there were any promises apart from the plea agreement.  "Such inquiries would have prompted disclosure of the promises on which Peavy relies here, or, if Peavy had remained silent, likely would foreclose his post-conviction reliance on [those] promises."  31 F.3d at 1345.

II.     Sentence Based on Facts Not Admitted

In his second ground for habeas relief, Petitioner argues that he was unconstitutionally deprived of his liberty when the trial court sentenced him on facts not admitted by Petitioner at his plea hearing and not found by a jury beyond a reasonable doubt.  Petitioner bases his argument largely on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004).  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts found not by the jury but by the judge.  Under the Washington scheme, the sentencing judge was required to impose a fixed sentence within a range determined by guidelines, and the judge was able to increase the maximum sentence under those guidelines on the basis of judicial fact-finding.  The Supreme Court found that this scheme offended the Sixth Amendment because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-92 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range.  *Id.*; *see also People v. Babcock*, 666 N.W.2d 231, 237 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range) but can never exceed the maximum sentence.  *Drohan,* 715 N.W.2d at 789.

Because the trial court can never exceed the maximum sentence set by statute, Michigan's indeterminate sentencing scheme, unlike the determinate sentencing scheme at issue in *Blakely*, does not infringe on the province of the finder of fact, and, thus, does not run afoul of *Blakely*.  *See Blakely,* 542 U.S. at 304-05, 308-09.  Because the trial court in the present case sentenced Petitioner well within the limits of Michigan's indeterminate sentencing scheme, it did not violate his Sixth Amendment rights.  *See Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *see also Gray v. Bell*, No. 1:06-cv-611, 2007 WL 172519, at *3 (W.D. Mich. Jan. 19, 2007); *Pettiway v. Palmer,* No. 1:06-cv-132, 2006 WL 1430062, at *1 (W.D. Mich. May 23, 2006); *Stanley v. Jones,* No. 1:06-cv-49, 2006 WL 1459832, at *2 (W.D. Mich. May 23, 2006); *Jones v. Trombley*, No. 2:07-cv-10139, 2007 WL 405835, at *3 (E.D. Mich. Jan. 31, 2007); *Mays v. Trombley*, No. 2:06-cv-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006); *Worley v. Palmer,* No. 2:06-cv-13467, 2006 WL 2347615, at * 2 (E.D. Mich. Aug. 11, 2006)

.     III.     Sentence Based on Inaccurate Information

In his third ground for habeas relief, Petitioner argues that he was erroneously scored five points for OV 12 and fifteen points for OV 19.[2]  Petitioner contends that, in scoring the points,

---

[2]Petitioner's third ground for habeas relief was not properly raised or addressed in his direct appeal.  Instead, it was raised in his subsequent collateral motion for resentencing.  As a consequence, it arguably is procedurally defaulted.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982); *Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004).  Petitioner contends, however, that the ineffective assistance of counsel serves as cause excusing his default.  *See House v. Bell*, 547 U.S. 518, 536 (2006);*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  Because the issue on the merits raises fewer questions than the issue of procedural default, I will reach the merits despite the likely preclusion of the claim by procedural default.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."))

the sentencing court effectively convicted him of three uncharged offenses: being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; carrying a concealed weapon in an automobile, MICH. COMP. LAWS § 750.227; and fleeing and eluding, MICH. COMP. LAWS § 750.479(a)(2).  Because he was not charged or convicted of the offenses, he asserts that the court's sentencing findings were based on false information, in violation of his right to due process.

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings.  *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993) (departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law).  There is no constitutional right to individualized sentencing.  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).  Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations."  *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord  Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Although state law errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "'could, potentially, "be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment."'"  *Koras v.*

*Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (quoting *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) (quoting *Pulley v. Harris*, 465 U.S. 37, 41 (1984))).   A sentence also may violate due process if it is based upon material "misinformation of constitutional magnitude."  *Koras,* 123 F. App'x at 213 (quoting *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 741 (1948).   To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984). *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)).   A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner broadly states that the facts relied upon by the court at sentencing were false. He does not, however, demonstrate or even describe what factual information was false. *Tucker*, 404 U.S. at 447.   A review of the record indicates that the sentencing court had ample evidence to find the existence of uncharged conduct for purposes of imposing points under OV 12.   Indeed, Petitioner admitted at his plea hearing that he was a convicted felon (Plea Tr., 15-16), that he possessed a firearm (Plea Tr., 12-13), and that the incident occurred while he was still on parole for another felony (Plea Tr., 16).   He therefore admitted to all of the elements of the offense of being a felon in possession,  MICH. COMP. LAWS § 750.224f.   Further, testimony introduced at the preliminary examination amply supported the conclusions that Petitioner was carrying a concealed weapon in an automobile and was fleeing and eluding police.

With respect to the facts underlying the scoring for OV 19, Petitioner merely argues that he denied having brandished a firearm at the pursuing deputy and that Deputy LaCross was unable to identify which robber brandished the firearm. Deputy LaCross clearly identified the driver as the person he saw waive the firearm, though he acknowledged that he did not get an opportunity to see the driver's face. (P. Tr., 79, 82.) However, Wayne Seggebruch already had testified that the second robber, the taller one wearing the backpack and carrying something in a hat or bag, got into the driver's seat of the car. (P. Tr., 62.) In his plea testimony, Petitioner acknowledged that he was the second robber to leave the store and that he fired his gun into the jewelry case and stole jewelry. (Pl. Tr., 12-13.) His testimony was consistent with the testimony of Ms. Medawar and Mr. Seggebruch that the second robber was taller, wore a backpack and was the driver. At the scene, the officers recovered the backpack, which contained paperwork belonging to Petitioner. (P. Tr., 90.) Based on the totality of the evidence, the sentencing judge's findings that Petitioner was the driver of the vehicle and that he had brandished the handgun were entirely reasonable and entitled to a presumption of correctness. Petitioner has failed to overcome that presumption. He therefore fails entirely to demonstrate the sort of egregious violation of state law that could implicate due process.

At bottom, Petitioner argues that, because he was not charged with the offenses, the court could not effectively convict him of the offenses by considering the uncharged conduct in calculating the guidelines. Contrary to Petitioner's characterization of his sentence, he was not found guilty of any charges in addition to those he admitted at his plea hearing. He did not receive a separate conviction or sentence for any other offense. Instead, the sentencing guidelines merely permitted the judge to consider as one factor in setting sentence whether Petitioner had committed other contemporaneous criminal acts that would not result in a separate conviction. *See* MICH. COMP.

Laws § 777.42(c).  The Supreme Court long has recognized that judicial factfinding in the imposition

of punishment does not violate due process as long as it does not increase the maximum penalty for

the offense.  *See McMillan v. Pennsylvania*, 477 U.S. 79, 85-88 (1986).  "Sentencing courts have

traditionally heard evidence and found facts without any prescribed burden of proof at all."  *Id.* at 91

(citing *Williams v. New York*, 337 U.S. 241 (1949)).  Because Petitioner was sentenced within the

maximum legal sentence, the sentencing findings were perfectly constitutional.

In sum, Petitioner has failed to demonstrate that the state court's findings violated his

rights under the Due Process Clause.

<u>Recommended Disposition</u>

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.

Dated:  March 4, 2009                         /s/  Joseph G. Scoville
                                              United States Magistrate Judge


**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within ten days
of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections
may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th
Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).